IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 26, 2007

## STATE OF TENNESSEE v. MICHAEL D. BOON

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 255718      Don W. Poole, Judge**

_____

**No. E2006-02320-CCA-R3-CD - Filed December 4, 2007**

_____

Following a bench trial, Defendant, Michael D. Boon, was found guilty of driving under the influence (DUI), first offense, a Class A misdemeanor. The trial court sentenced Defendant to eleven months, twenty-nine days, to be suspended after serving forty-eight hours in confinement. On appeal, Defendant argues that the trial court erred in denying his motion to suppress and contends that the admission of certain testimony violated his constitutional right to confront witnesses. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Jerry H. Summers and Marya L. Wegenka, Chattanooga, Tennessee, for the appellant, Michael D. Boon.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William H. Cox, III, District Attorney General; and Neal Pinkston, Assistant District Attorney, for the appellee, the State of Tennessee.

## OPINION

## I.  Suppression Hearing

Prior to trial, Defendant filed a motion to suppress the evidence against him arguing that the arresting officer did not have reasonable suspicion to stop Defendant's vehicle. At the suppression hearing, Officer Victor Woughter, with the Chattanooga Police Department, testified that he was traveling eastbound on I-24 on March 24, 2005, at approximately 11:00 p.m. Officer Woughter observed a silver Ford Focus in front of him which was weaving back and forth in the traffic lane. Officer Woughter activated his video camera and followed the vehicle to the East Brainerd Road area

on I-75. Officer Woughter said the vehicle crossed over either the dashed line on the right of the vehicle or the left yellow line approximately ten to twelve times.

Officer Woughter said that the vehicle maintained a fairly consistent speed until the I-75 interchange when the vehicle increased its speed. Officer Woughter followed the vehicle at a consistent distance for approximately two-tenths of a mile. Based on his speedometer, Officer Woughter testified that the vehicle during this time was traveling eighty miles per hour in a fifty-five-mile per hour speed zone. Officer Woughter then activated his blue lights based on the driver's erratic driving and speed.

On cross-examination, Officer Woughter stated that his patrol car had been driven approximately 85,000 miles at the time of the stop. Officer Woughter did not know when the vehicle's speedometer was last calibrated.

Defendant testified on his own behalf. Defendant said that on the the night in question he was driving in a Ford Focus to his home in East Brainerd. He entered I-24 at the Fourth Avenue entrance ramp and observed a patrol car behind him. Defendant said he maintained a consistent speed of between fifty and fifty-two miles per hour while the patrol car was behind him.

Defendant stated this his vehicle had been driven approximately 121,000 miles at the time of the incident. Defendant said that the vehicle had problems with acceleration and had never been driven at a speed of eighty miles per hour. On cross-examination, Defendant said he used his turn signal when he pulled his vehicle off I-75 for the traffic stop but acknowledged that he had not used his turn signals when he switched lanes while Officer Woughter was following him.

Gene Boon, Defendant's father, testified that Defendant primarily drove the Ford Focus back and forth from home and work. Mr. Boon said that once the vehicle had been driven seventy or eighty thousand miles, it began incurring significant emissions problems. Mr. Boon said that the vehicle would lose power and stall. Mr. Boon stated that the vehicle had been driven no faster than between approximately seventy and seventy-five miles per hour.

At the conclusion of the suppression hearing, the trial court found that Officer Woughter had reasonable cause to initiate the stop of Defendant's vehicle based on Defendant's erratic driving and driving in excess of the posted speed limit. The trial court observed:

> [n]ow, I don't know what speed they were going, but certainly Officer Woughter, as an experienced officer, can say what his speed was and look at [Defendant] and give an opinion about what his speed is. Whether it was [eighty] miles an hour or not, I'm not making that determination, but I do think there's enough speed there and I do think there's enough weaving there, I do think there's enough touching the yellow on the left and the white broken line on the right, to indicate there was a reasonable and articulable suspicion to stop [Defendant].

## II. Trial

At trial, the parties agreed to stipulate that the testimony of Officer Woughter, Mr. Boon and Defendant would be the same testimony that they offered during the suppression hearing.

Dawn Swiney, with the toxicology section of the T.B.I., was asked to perform a blood alcohol report for the sample of blood taken from Defendant. Agent Swiney said she received two tubes of blood to which an anticoagulant and a preservative had been added. Agent Swiney said that she placed approximately one milliliter of Defendant's blood sample in a head space gas chromatogram for testing. Agent Swiney testified that the test results showed 0.16 gram percent ethyl alcohol in Defendant's blood sample, with a five percent margin of error.

On cross-examination, Agent Swiney stated that the gas chromatogram was manufactured by Perkin Elmer and was approximately five or six years old. Agent Swiney said that the manufacturer performed routine maintenance on the instrument, the dates of which would be noted on the instrument's maintenance records. Agent Swiney believed that the instrument had been serviced within the last six months before trial but could not say definitively without the maintenance records. Agent Swiney said that the T.B.I.'s maintenance records were maintained in accordance with the standards set by the American Society of Crime Laboratory Directors. Agent Swiney acknowledged that there were no quality controls in place for the blood alcohol kits used to store an individual's blood sample. Agent Swiney said that she routinely checked the integrity of the test tubes containing a blood sample before testing the sample.

On redirect examination, Agent Swiney stated that she ran a series of standards through the gas chromatogram prior to testing Defendant's blood sample, and her records indicated that there were no problems with the instrument.

## III. Suppression of Evidence

Defendant argues that the trial court erred in denying his motion to suppress because Officer Woughter lacked reasonable suspicion to justify the stop. Specifically, Defendant argues that the State failed to prove that Officer Woughter's speedometer had been recently calibrated before or after the traffic stop. Secondly, Defendant argues that any weaving within his own lane was insufficient to support the requisite reasonable suspicion under our supreme court's decision in *State v. Binette*, 33 S.W.3d 215 (Tenn. 2000).

A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *see also State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. Furthermore, "questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."

*Id*. However, this Court reviews the trial court's application of the law to the facts under a *de novo* standard of review without any deference to the determinations of the trial court. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

Defendant urges this Court to dispense with the presumption of correctness ordinarily afforded a trial court's finding because the evidence was based on the video tape of Defendant's driving and did not raise an issue as to credibility. In *Binette*, the Supreme Court observed that "when a trial court's findings of fact on a motion to suppress are based solely on evidence that does not involve issues of credibility, appellate courts are just as capable to review the evidence and draw their own conclusions." *Binette*, 33 S.W.3d at 217. Accordingly, the *Binette* court concluded that in circumstances where the only evidence presented to the trial court does not raise an issue as to credibility, "a reviewing court must examine the record *do novo* without a presumption of correctness." *Id*. In the case *sub judice*, however, Defendant placed credibility directly at issue by testifying, and the trial court was called upon to assess the credibility of the witnesses and resolve any conflicts. We will thus extend a presumption of correctness to the trial court's findings in this regard.

The Fourth Amendment to the United States Constitution grants the right to be secure from unreasonable searches and seizures, and prohibits the issuance of warrants without probable cause. Article I, § 7 of the Tennessee Constitution is identical in purpose and intent with the Fourth Amendment. *State v. Troxell*, 78 S.W.3d 866, 870 (Tenn. 2002). Under both constitutions, a warrantless search or seizure is presumed to be unreasonable, and the resulting evidence is subject to suppression unless the state demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *Binette*, 33 S.W.3d at 218.

These constitutional protections against unreasonable searches and seizures also apply to vehicles. *Troxell*, 78 S.W.3d at 870-71. In order to stop a vehicle, a law enforcement officer must have probable cause or reasonable suspicion supported by specific and articulable facts to believe an offense has been or is about to be committed. *Randolph*, 74 S.W.3d at 334. In determining whether reasonable suspicion existed for the stop, a court must consider the totality of the circumstances. *Binette*, 33 S.W.3d at 219.

Officer Woughter testified at the suppression hearing that he followed Defendant's vehicle at a consistent distance and, based on his speedometer, both vehicles were traveling at a speed of eighty miles per hour. Officer Woughter did not know when his speedometer had last been calibrated. A police officer may properly testify as to the speed with which a suspect is driving based on his or her visual observation of the speed that it took to keep pace with the suspect's vehicle. *See State v. Woodard Joyner*, No. 02C01-9106-CR-00124,1992 WL 105973, at *2 Tenn., at Jackson, May 20, 1992), *no perm. to appeal filed* (observing that such testimony is admissible when "an adequate foundation existed for the admission of this testimony, i.e., the deputy observed the appellant's motor vehicle for one-fourth of a mile; and the deputy was aware of the speed that it took to keep pace with the appellant"). Based on our review, we conclude that the evidence does not

preponderate against the trial court's finding that the speed at which Defendant was driving was a factor supporting the initiation of a traffic stop.

A reasonable suspicion to initiate a traffic stop depends on the totality of the circumstances. *State v. Yeargen*, 958 S.W.2d 626, 632 (Tenn. 1997). The trial court, observing that the video tape was the best evidence, also found that Defendant's vehicle either touched or crossed both the white line and the yellow line at least seventeen times while Officer Woughter was taping his driving. The trial court stated, "Defendant then travels to the middle lane and crosses, or touches, the lines in that middle lane some three times before he gets back into the fast lane again on the left." Based on its observations of the video tape, the trial court found that there was a reasonable and articulable suspicion to initiate a traffic stop.

In *Binette*, our supreme court cautioned that "'if failure to follow a perfect vector down the highway . . . [was] sufficient[ ] to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy.'" *Binette*, 33 S.W.3d at 219 (quoting *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir. 1993)). In *Binette*, the video camera in the patrol car following the defendant taped his driving. After reviewing the video tape, the supreme court concluded that "[w]hile [the defendant] did move laterally at times within his lane while operating his vehicle, we find that his movement was not pronounced, and therefore did not give rise to reasonable suspicion that he was under the influence of an intoxicant." *Id.* at 220.

"Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made safely. . . ." T.C.A. § 55-8-123(1). We have reviewed the videotape of Defendant's driving. Unlike the situation in *Binette* where the defendant apparently did not touch or cross the lane lines, Defendant's wheels either touched or crossed the yellow and white lines demarcating his lanes at least the seventeen times mentioned by the trial court. Although it was late in the evening, considerable traffic was present on the interstate. On three occasions, Defendant switched lanes without using his turn signal which could have affected the other traffic on the interstate as well as Officer Woughter's vehicle which was behind Defendant's vehicle. *See* T.C.A. §§ 55-8-142 and 143 (requiring that turn signals be used to indicate turns if other traffic may be affected by the movement).

Based on the foregoing, we conclude that Officer Woughter had reasonable suspicion supported by specific and articulable facts to conduct an investigative stop, and that the evidence gained from the stop was properly admitted at trial.

### III. *Crawford* Issues

Defendant argues that the trial court erred by permitting TBI forensic toxicologist Dawn Swiney to testify about the reliability and accuracy of the gas chromatogram machine used to determine Defendant's blood alcohol content (BAC), and about the reliability and accuracy of the

blood alcohol testing kits used by law enforcement agencies to send blood samples to the TBI lab. Defendant asserts that by these errors, the trial court also erred by admitting into evidence the alcohol report from the TBI lab, which showed that Defendant had a BAC of 0.16. As will be shown below, Defendant's counsel had no objection to the admission of the TBI lab report into evidence.

Rule 10(b) of the Rules of the Court of Criminal Appeals of Tennessee provides that "[i]ssues which are not supported by argument, citation to authorities, or *appropriate references to the record* will be treated as waived in this court." (emphasis added). Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure requires an appellant's argument in his brief to contain references to the record.

In his appellate brief, Defendant failed to identify the precise testimony of Ms. Swiney which he asserts is inadmissible testimonial hearsay which violates the Confrontation Clause, pursuant to *Crawford v. Washington*, 514 U.S. 36, 124 S. Ct. 1354 (2004). Defendant likewise has not identified where Ms. Swiney testified as to the accuracy and reliability of either the gas chromatogram machine or the blood alcohol test kits. In the statement of facts section of the brief, although Defendant does give citations to the record, Defendant does not mention that Ms. Swiney testified about the accuracy and reliability of the gas chromatogram machine and the blood test kits. Notwithstanding potential waiver by Defendant, we have carefully reviewed the entire trial testimony of TBI forensic toxicologist Dawn Swiney, and will address the issue on the merits.

Our review shows that Ms. Swiney testified on direct examination that a gas chromatogram machine was used to test Defendant's blood sample; that the test takes approximately two minutes; that the blood sample was received in a gray stopper tube from the blood alcohol test kit, which preserved the blood sample; that the test showed a BAC of 0.16; that she prepared a report of the test results (which was admitted into evidence at the trial); and that the gas chromatogram had a margin of error of plus or minus five percent. During cross-examination by Defendant's counsel, Ms. Swiney was questioned regarding the chain of custody; dates the sample was taken, sent to the TBI lab, and tested at the lab; where the sample was kept and under what conditions it was kept in the lab; the manufacturers of the gas chromatogram machine and the blood test kits; who serviced the gas chromatogram and blood test kits; and the quality control procedures on the blood test kits. On redirect examination Ms. Swiney testified the procedure that she followed in all her cases was the same procedure followed in testing Defendant's blood sample; that the machine self-tests by running a series of standards "throughout the alcohol run" to ensure the machine is in proper working condition when the tests are performed; and that her records showed that there was nothing wrong with the machine when the test was run on Defendant's blood sample. On further re-direct she confirmed that she understood the testing procedure and "what it's looking for."

Pertinent to the issue raised by Defendant is the following, which consists of the entire recross-examination by Defendant's counsel:

Q.                              Ms. Swiney, as far as the way this machine operates, am I correct that that's beyond your area of expertise?

It's a machine that y'all purchased, you push the buttons and get the readings? As far as the actual way the machine operates and how it's built and so forth, you've not had any special training or back to the manufacturer to learn those procedures, have you?

A.     I have not had any training by the manufacturer to work on this instrument.

[DEFENSE COUNSEL]:     Thank you.

Defendant's counsel stated his objection (after Ms. Swiney's testimony was completed) to Ms. Swiney's testimony as follows:

[DEFENSE COUNSEL]:     So my argument on that point, Your Honor, I would address only the same issue, as far as *Crawford* comes into play, deals with the question of two aspects of this with what Ms. Swiney had to say. One is the actual machine that's tested, the machine, Your Honor, as to whether it is reliable or not, and, secondly, the dealing with the blood kits.

And it's our contention, and whether - - to be honest with you, Judge, I haven't seen anything around the country dealing with blood kits. Now, as far as machines, there's a multitude of decisions that deal with different machines. In this one we're taking it to the lab instead of to the Intoximeter, the intolinizer, the breathalyzer and so forth, whether the application of *Crawford*, whether that decision is applicable to a gas chromatogram is something that I haven't seen any decisions on.

But that's the basis of my objection to her testimony and the results in this matter, Your Honor, is on the question of whether he was or was not under the influence, would be the question of the, whether under *Crawford*, *the right of confrontation*, under the Tennessee and federal constitution, *is violated by them not proving with the people who have the expertise or the maintenance records of the gas chromatograph, as well as these blood kits*. And

-7-

that's my objection to that. That's all I have, Your Honor. (emphasis added).

In his motion for new trial, Defendant asserted grounds (4) and (5) as follows:

(4) That the Trial Court erred in allowing *inadmissible hearsay testimony* as to the defendant's *blood alcohol content* in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004) and the confrontation clause of article 1, section 9 of the Tennessee Constitution because at the trial the forensic chemist or technician *who performed the analysis of the blood sample* from the defendant *could not testify about the reliability* of the gas chromatography. (emphasis added).

(5) That the Court erred in admitting *inadmissible hearsay as to the* commercial blood kit used in preserving the defendant's blood sample in violation of the holding in *Crawford*, 541 U.S. 36, 124 S. Ct. 1354 and the confrontation clause of article 1, section 9 of the Tennessee Constitution because at the trial the forensic chemist or technician who performed the analysis of the blood sample drawn from the defendant could not testify about the reliability of the process or kit used in preserving the blood sample. (emphasis added).

Nothing in the record on appeal indicates what, if any, objection Defendant made to Ms. Swiney's proposed testimony prior to the bench trial. The first instance where an objection to Ms. Swiney's testimony appears is during her direct examination by the State:

Q.                          So we're dealing with - - what was the finding of the ethyl alcohol amount that you found in your test?

A.                          In this case it was a .16 grams [sic] percent.

Q.                          Okay. And in that five percentage of error could be anywhere from a .15, possibly, to a .17?

A.                          That's correct.

Q.                          And do you prepare a report when you make your findings?

A.                          Yes, I do.

[PROSECUTOR]:               One moment, Judge. If may I approach?

THE COURT:                  You may.

-8-

| | |
|---|---|
| [DEFENSE COUNSEL]: | *Judge, I don't have any objection to the report, I would want to object to the overall procedure when I cross-examiner [sic] her. But I have no objection to the report.* |
| Q. | Ma'am, I'll ask you if you can recognize that report? |
| A. | Yes, this is the report that I generated on this case. |
| Q. | And this would be a copy of the one that you have, is that correct? |
| A. | That's correct. |
| [PROSECUTOR]: | Judge, at this time we'd like to mark the official alcohol report, submitted by Ms. Swiney, as the next exhibit, I think that would be No. 12. |
| THE COURT: | Let that be marked and entered as Exhibit 12 based on the statement by [Defense Counsel]. |
| | (Thereupon, the document was marked Exhibit No. 12 and received in evidence). |

(emphasis added).

It is not clear in the record up to this point precisely what Defendant's counsel was intending to object to by announcing an objection "to the overall procedure." During the entire cross-examination and recross-examination of Ms. Swiney, Defendant's counsel never made any objection to any responses to his questions.

Defendant argues that "[u]nless the person responsible for the maintenance of an instrument [is] available for cross-examination, defendant's [constitutional] right to confront the witnesses against him is violated." Defendant further argues that "[u]nder the Confrontation Clause, the defendant has the right to confront the manufacturer of this machine who was responsible for servicing the machine and insuring that it operated properly" . . . and that "[b]y allowing Ms. Swiney to testify about the accuracy and reliability of the machine and blood kits and admitting her alcohol report into evidence, the trial court erred."

There is no question that Defendant clearly relies upon *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), and his constitutional rights to confront the witnesses against him, U.S. Constitution Amend. VI and Tennessee Constitution article 1, section 9, in arguing that the evidence of Defendant's BAC of 0.16 was erroneously admitted into evidence at his trial.

As recently noted by the Tennessee Supreme Court in *State v. Lewis*, _____ S.W.3d _____, No. M2004-02255-SC-R11-CD, 2007 WL 233296 (August 17, 2007), the United States Supreme Court in *Crawford* "established a new standard for the admissibility of hearsay statements under the Confrontation Clause." *Lewis*, 2007 WL 233296 at *4. "Testimonial hearsay" is inadmissible in the face of a Confrontation Clause objection unless the declarant is unavailable *and* the accused had the prior opportunity to cross-examine the declarant. *State v. Maclin*, 183 S.W.3d 335, 345 (Tenn. 2006) (citing *Crawford*).

Defendant appears to argue generally that the inadmissible hearsay evidence was (1) that the gas chromatogram machine manufactured by the Perkin Elmer company is accurate and reliable, and (2) that the blood alcohol kit manufactured by Tri-Tech company is accurate and reliable. Our review of the record reveals that Ms. Swiney never testified specifically that either the gas chromatogram or the blood alcohol test kits were reliable and/or accurate.

Ms. Swiney did testify as to the testing machine's margin of error being plus or minus five percent. On cross-examination, Defendant's counsel thoroughly questioned Ms. Swiney about procedures for the maintenance and service of the gas chromatogram machine and the blood alcohol test kits, but never asked Ms. Swiney specifically about the reliability or accuracy of the machine or the kits. On redirect examination Ms. Swiney testified about the testing machine having a "series of standards" completed during each testing as a "self test." On recross-examination she acknowledged that she had received no training from the manufacturer on how to "work on" the gas chromatogram machine.

In support of his argument, Defendant relies upon *Shiver v. State*, 900 S.W.2d 615 (Fla. Dist. Ct. App. 2005), wherein the defendant was convicted of felony driving under the influence. Pursuant to a particular provision of a Florida statute, the State was required to prove that the alcohol breath test machine used to test the defendant's BAC had received the statutorily required maintenance; otherwise the breath test results would be inadmissible. The prosecution submitted an affidavit which contained the information showing the machine had been subjected to proper maintenance procedures. However, the witness through whom the affidavit was introduced was the arresting officer, who had no personal knowledge abut the machine's maintenance. The Florida appellate court held that admission of the hearsay in the affidavit was in violation of the defendant's Confrontation Clause rights as espoused in *Crawford*, and reversed the conviction. Since proof of statutorily mandated maintenance of the machine was a necessary prerequisite to the admissibility of the BAC results, the information was obviously prepared for admission at trial, and, accordingly was testimonial hearsay evidence. *Shiver*, 900 S.W.2d at 618. As recognized by Defendant in his brief, there is no such statutory requirement in Tennessee as in Florida. Furthermore, in *Shiver*, the record clearly showed inadmissible testimonial hearsay had been erroneously admitted as evidence.

Defendant's failure to specifically cite to the record what testimony he asserts was inadmissible testimonial hearsay in violation of *Crawford* requires that we must theorize as to what Defendant argues was improper testimony. The only testimony which comes even close to being

testimony of the accuracy and/or reliability of the gas chromatogram machine and the blood alcohol test kits, which was elicited by the State on either direct or redirect examination, is the following:

(1) The margin of error in each blood alcohol test is plus or minus 5 percent, such that a reading of 0.16 could be a BAC anywhere from a 0.15 to a 0.17;

(2) The gas chromatogram machine has a self-test procedure to ensure it is operating properly at the time a defendant's sample is being tested.

(3) The preservative/anti-coagulant in the tubes of the blood alcohol test kit prevent the blood sample from being degraded, so that it can be tested;

There is no explicit testimony from Ms. Swiney of how she knew about the margin of error or how she knew about the self-test procedure on the gas chromatogram or the preservative and anti-coagulant properties even though she acknowledged:

(a) She had not been trained on how to "work on" the gas chromatogram machine.

(b) She did not do the maintenance or servicing of the machine or the kits.

(c) She did not have the maintenance schedule of the testing machine with her at trial.

(d) She did not know who is responsible for maintaining, testing, or the quality control of the blood alcohol test kit.

While there was detailed testimony from Ms. Swiney (most of it during cross-examination by Defendant) about various aspects of the gas chromatogram machine and the blood alcohol test kits that she was unfamiliar with, there was no testimony from her as to how she was aware of (1) the margin of error in the testing machine; (2) the machine's self-testing capabilities; or (3) the preservative and anti-coagulant capabilities of the blood alcohol test kits. Therefore, it would be speculation on our part to conclude that her testimony concerning these matters was hearsay. Unless the evidence is testimonial hearsay, a Confrontation Clause violation does not occur.

Defendant quotes from *State v. Johnson*, 717 S.W.2d 298, 303 (Tenn. Crim. App. 1986), in support of his argument on this issue, that "test results are admissible only when the tests are shown to have been administered by qualified personnel and when it is shown the testing device is scientifically acceptable and accurate for the purpose that it is being employed." *Id*. at 303. However, Defendant's Confrontation Clause issue is not addressed by *Jackson*. Defendant did not argue at trial, or on appeal, that Ms. Swiney was not qualified to *administer the test* on Defendant's blood sample. Likewise, Defendant did not argue at trial or on appeal that the gas chromatogram

machine or the blood alcohol test kits were not scientifically acceptable. While Defendant did contest at trial and on appeal a Confrontation Clause violation with some unidentified portion of Ms. Swiney's testimony, he never contested the fact that the *testing method used* was accurate for the purpose that it was being employed. In other words, before raising a *Crawford* issue in a case such as this, a defendant must show that inadmissible testimonial hearsay is being offered as evidence. In this case, Defendant did not object to the evidence on the basis that the *Johnson* factors had not been proven. Until that objection would be made, it is unknown whether the testimony by Ms. Swiney was testimonial hearsay. Since the record is not clear that the pertinent testimony of Ms. Swiney was hearsay, much less testimonial hearsay, Defendant is not entitled to relief on this issue.

## CONCLUSION

After review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE